**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PALDO SIGN AND DISPLAY COMPANY, <br> an Illinois corporation, and SABON, INC., <br> a Florida corporation, individually and as <br> representatives of a class of similarly-situated <br> persons, | ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | No. 13 C 1896 |
| v. | ) <br> ) | Judge Jorge L. Alonso |
| UNIFIED MARKETING, LLC, et al., | ) <br> ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are four motions. For the reasons explained below, the motions of

defendants j2 Global Canada, Inc. and j2 Global, Inc. (the "j2 Defendants") for summary

judgment [147, 150] are granted; plaintiffs' motion to strike declarations and portions of

defendants' motions, memoranda, and fact statements; to bar certain evidence; and to set a

briefing schedule on class certification [153] is granted in part and denied in part; and the j2

Defendants' motion to strike portions of plaintiffs' memorandum in opposition to defendants'

motions and statement of additional facts [175] is denied.

## BACKGROUND

This is a single-count putative class action under the Telephone Consumer Protection

Act, 47 U.S.C. § 227 ("TCPA"), in which plaintiffs, Paldo Sign and Display Company ("Paldo")

and Sabon, Inc. ("Sabon") allege that they received junk faxes that did not display a proper opt-

out notice as required. Paldo alleges that on September 28, 2009, it was sent an unsolicited fax

that advertised a "limited time offer" for a "free" "brand new combination snack & soda vending

machine." (ECF No. 71, Second Am. Class Action Compl. ¶¶ 28, 32 & Ex. A.)  Sabon alleges that it was sent a nearly identical unsolicited fax on May 23, 2011.  (*Id.* ¶¶ 29, 32 & Ex. B.)  The operative complaint, the Second Amended Complaint, names the following defendants: Unified Marketing, LLC ("Unified Marketing"); United Vending and Marketing, Inc. ("United Vending"); Sunrise Marketing & Vending, Inc. ("Sunrise"); Global Vending Services Inc. ("Global Vending"); Matthew A. Capicchioni; Nicholas G. Chomakos; Laura E. Chomakos (all of whom plaintiffs collectively call the "Vending Machine Advertisers"); Accelero Communications, Inc. ("Accelero"); Digitalspeed Communications, Inc. ("Digitalspeed"); Slingshot Technologies Corporation ("Slingshot"); j2 Global, Inc. ("j2 Global"); j2 Global Canada, Inc. ("j2 Canada"); Tyler Eyamie; and John Does 1-10.

Although plaintiffs have not filed a return of service as to Unified Marketing, United Vending, Sunrise, Global Vending, or Matthew A. Capicchioni, it appears that those defendants have been served.  The parties stated in a joint status report that Capicchioni was served but has not appeared.  (ECF No. 124 at 2.)  Unified Marketing, United Vending, Sunrise, and Global Vending are entities affiliated with the Chomakoses, who are proceeding pro se.  No attorney has entered an appearance on behalf of those entities.  Judge Darrah, to whom this case was previously assigned, dismissed Eyamie for lack of personal jurisdiction.  (ECF No. 104.)  After the case was reassigned to this Court, plaintiffs voluntarily dismissed Accelero, Digitalspeed, and Slingshot.  (ECF Nos. 132 & 134.)

Defendants j2 Global[1] and j2 Canada filed motions for summary judgment, which are now before the Court. Both sides have filed motions to strike certain evidence submitted in connection with the summary judgment motions; the Court first will address the motions to strike.

## MOTIONS TO STRIKE

### A.    Plaintiffs' Motion to Strike

Plaintiffs ask the Court to strike the declarations of David Allen Tough, David Guerrero, and Teruko Furuya (the "Declarants")—which the j2 Defendants submitted in support of their motions for summary judgment—as well as "all portions" of defendants' motions, memoranda in support, and Local Rule 56.1 Statements that rely on those declarations. (ECF No. 153, Pls.' Mot. Strike 1.) Plaintiffs contend that defendants should not be permitted to use the evidence the Declarants supply because defendants did not previously disclose them as potential witnesses. Plaintiffs also seek to strike "untimely produced documents." (*Id.*)

Federal Rule of Civil Procedure 26 requires a party to provide to the other parties "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). A party who has made a Rule 26(a) disclosure must supplement that disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not

_____

[1] j2 Global now refers to itself as "j2 Cloud Services, Inc., formerly known as j2 Global, Inc.," but the Court will call it "j2 Global" herein for the sake of simplicity and consistency with the case caption and previous filings.

otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). To ensure compliance with these requirements, Rule 37(c)(1) provides that if a party "fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Preclusion is "automatic and mandatory" unless "the offending party can establish that its violation of Rule 26(a)(2) was either justified or harmless." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008) (internal quotation marks omitted). "In addition to or instead of" preclusion, the court may order other sanctions. Fed. R. Civ. P. 37(c)(1). "Whether a failure to comply with Rule 26(a) or (e) is substantially justified, harmless, or warrants sanctions is left to the broad discretion of the district court." *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 514 (7th Cir. 2011).

It is undisputed that the j2 Defendants never identified Tough, Guerrero, or Furuya as individuals who were likely to have discoverable information. The j2 Defendants contend, however, that they had no duty to supplement their Rule 26 disclosures because the Declarants were otherwise made known to plaintiffs before the close of discovery. Tough and Guerrero were the individuals who verified, respectively, j2 Canada and j2 Global's supplemental responses to interrogatories.[2] (ECF Nos. 153-6 & 153-8.) As for Furuya, defendants state that it is "unclear" whether plaintiffs knew about her prior to the submission of her declaration in connection with the summary judgment motions, but they argue that she is "simply a j2

---

[2]Tough is j2 Canada's Director of Software Development. (ECF No. 149-10, Decl. of David Allen Tough ¶ 1.) Guerrero is employed by j2 Global in its Customer Service Department. (ECF No. 152-14, Decl. of David Guerrero ¶ 1.)

representative testifying in her corporate capacity" and the information contained in her declaration already became known to plaintiffs during the discovery process. (ECF No. 171, Defs.' Mem. Opp'n Pls.' Mot. Strike 8-9.) Even if they did have a duty to supplement, say defendants, plaintiffs have failed to demonstrate a lack of substantial justification or that they suffered any harm from the failure to disclose the Declarants. Alternatively, defendants suggest, any harm could be cured by allowing plaintiffs to depose the Declarants regarding the statements they make.

Plaintiffs concede that Tough and Guerrero verified defendants' supplemental interrogatory responses but emphasize that defendants tendered those responses as well as certain j2 Canada documents on January 11, 2016, the last day of the discovery period. According to plaintiffs, those disclosures were untimely. (ECF No. 181, Pls.' Reply Supp. Mot. Strike 2, 9-10.) The Court disagrees. Plaintiffs knew within the discovery period that Tough and Guerrero were individuals with information responsive to their interrogatories. Moreover, j2 Canada produced the documents at issue within the discovery period. Yet plaintiffs did not follow up on these matters, seek to extend the discovery period in an effort to depose Tough or Guerrero, or file any discovery motion despite the fact that they now complain broadly about defendants' discovery responses and "substantial[] and irreparabl[e]" prejudice. This Court held a status hearing on January 21, 2016, during which plaintiffs' counsel did not raise any discovery concerns and in fact affirmed that discovery was closed and indicated that the next step after settlement discussions would be to set a briefing schedule on j2 Global's anticipated motion for summary judgment. (ECF No. 186, Tr. of 1/21/16 Hr'g 3.) The Court therefore set such a briefing schedule.

The Court further notes that despite having been on notice through the j2 Defendants' Rule 26(a)(1) disclosures that defendants would rely on unnamed corporate representatives and employees who had knowledge of defendants' relevant business practices and policies and extent of involvement in the transmission of faxes, plaintiffs never sought a Rule 30(b)(6) deposition of a j2 representative. Consequently, plaintiffs' claims of prejudice ring hollow. *See Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, No. 12 C 3233, 2016 WL 7034074, at *4 n.9 (N.D. Ill. Dec. 2, 2016) ("[I]nferences from silence are often perilous. But not always in a context where some prompt outcry would be expected. If the plaintiff truly was handicapped by not having names of those who it was claimed had agreed to receive faxes, it is doubtful that it would have said nothing and proceeded through discovery."); *Krawczyk v. Centurion Capital Corp.*, No. 06 C 6273, 2009 WL 395458, at *6 (N.D. Ill. Feb. 18, 2009) ("Any prejudice to Plaintiff resulted from not conducting his own discovery with respect to Defendants' witnesses, not from Defendants' bad faith or willfulness in failing to specify the names of the representatives whom they intended to use."). It is telling that plaintiffs do not invoke Federal Rule of Civil Procedure 56(d) or contend that the Court should reopen discovery to allow them to obtain facts essential to justify their opposition, but rather simply move to strike the declarations of Tough, Guerrero, and Furuya and urge the Court to "reject Defendants' 'offer' to reopen discovery." (Pls.' Reply Supp. Mot. Strike 14.)

Because it was made known to plaintiffs within the discovery period that Tough and Guerrero possessed relevant information and plaintiffs had a fair opportunity to ask the Court to allow additional discovery from them prior to the filing of defendants' summary judgment motions (and prior to the Court's setting a briefing schedule), as well as a fair opportunity to seek follow-up discovery on the j2 Canada documents, the Court will not strike Tough or

Guerrero's declarations, bar them from testifying, bar use of the j2 Canada documents, or strike the portions of defendants' statements, motions, and memoranda that rely on these declarations or documents. *See Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 732-33 (7th Cir. 2004) (where defendants submitted an affidavit in support of their summary-judgment motion and plaintiffs had known prior to the close of discovery about the affiant and that she had relevant information, the district court did not abuse its discretion in denying plaintiffs' motion to strike the affidavit).

In contrast with Tough and Guerrero, Furuya was not made known to plaintiffs before the close of discovery. And the Court is not persuaded that it should excuse defendants' failure to disclose her as a potential witness on the ground that she is "simply" a corporate representative of j2 whose declaration consists of information of which defendants say plaintiffs are aware. The issue is not whether plaintiffs already knew generally of the information contained in her declaration, but whether plaintiffs were on notice that *Furuya* had relevant information. *See, e.g., Gutierrez*, 382 F.3d at 733-34. They were not. Furthermore, defendants misstate the burden when they assert that plaintiffs have failed to demonstrate a lack of substantial justification or that they suffered any harm from the failure to disclose Furuya. It is *defendants'* burden to show that their failure to disclose Furuya was either justified or harmless. *See Ciomber*, 527 F.3d at 641. Defendants rely only upon the latter. To evaluate harmlessness, the Court considers the following factors: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Defendants argue that plaintiffs are not prejudiced by the use of Furuya's declaration because plaintiffs "already deposed all of the key witnesses with personal knowledge relating to the transactions at issue" and they chose not to depose any j2 witnesses other than Eyamie. (Defs.' Mem. Opp'n Pls.' Mot. Strike 11.) These arguments miss the point. j2 Global uses Furuya's testimony about defendants' corporate structure to support its motion, and her identity was never disclosed prior to the filing of defendants' summary-judgment motions. Plaintiffs were prejudiced because they were not put on notice that Furuya possesses information pertinent to the case such that they would be expected to request her deposition or anticipate the use of her declaration in support of summary judgment. It matters not that defendants believe plaintiffs should have taken other depositions or that Furuya is not a "key" witness.

Because defendants failed to disclose Furuya as a potential witness, her identity as a potential witness was not otherwise made known to plaintiffs during the discovery process, and defendants have failed to show that the failure to disclose her was substantially justified or harmless, the Court strikes her declaration. But the Court denies as unnecessary plaintiffs' request to strike those portions of defendants' summary-judgment materials that rely solely on Furuya's declaration. As discussed below, the Court is not an editor and has not relied on Furuya's declaration in deciding the instant motions.

Plaintiffs also ask the Court to 1) strike the defendants' motions for summary judgment for failure to timely disclose the Declarants; 2) bar the Declarants from offering evidence or participating in this litigation; and 3) set a briefing schedule on plaintiffs' anticipated motion for class certification. The Court denies each request. Striking Furuya's declaration itself is a sanction commensurate with the failure to disclose her, but striking defendants' motions would be highly disproportionate. There is no ripe controversy as to plaintiffs' second request because

defendants do not seek at this time to use the Declarants to offer any additional testimony in this litigation. As to the third request, there is no pending motion for class certification, so the Court will cross the scheduling bridge when it comes to it.

**B.     Defendants' Motion to Strike**

The j2 Defendants ask the Court to strike certain portions of plaintiffs' Local Rule 56.1 statement of additional facts; corresponding portions of plaintiffs' memorandum in opposition to defendants' summary judgment motions; and several of plaintiffs' exhibits. Essentially, defendants seek to have the Court carve out what they deem to be objectionable or unpersuasive portions of plaintiffs' summary judgment materials. Defendants' motion itself (quite aside from the thirteen-page supporting memorandum) contains a ten-page detailed list of portions defendants seek to have stricken. This sort of motion to strike is particularly disfavored, see *Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 726 (7th Cir. 2006), and "waste[s] time by requiring judges to engage in busywork and judicial editing without addressing the merits of a party's claim," *U.S. Bank Nat'l Ass'n v. Alliant Energy Res., Inc.*, No. 09–cv–078–bbc, 2009 WL 1850813, at *3 (W.D. Wis. June 26, 2009). "The way to point out errors in an [opponent's] brief is to file a reply brief, not to ask a judge to serve as editor. . . . The judiciary has quite enough to do deciding cases on their merits." *Custom Vehicles*, 464 F.3d at 726. Defendants' motion does little to advance the ball in this litigation and is therefore denied. To the extent necessary, the Court will address within its discussion of the summary judgment motions the materials to which defendants object.

## MATERIAL FACTS

Plaintiffs' complaint sets out two time frames during which the Vending Machine Fax was allegedly unlawfully transmitted. Plaintiffs allege that the j2 Defendants are responsible for

the transmission of the subject junk faxes from 2009 through 2011; this time period includes the fax allegedly sent to Paldo. For purposes of the instant motions, plaintiffs do not dispute that the fax allegedly sent to Sabon in 2011 was sent by an entity other than the j2 Defendants, nor do they dispute that the statute of limitations bars recovery for any faxes sent prior to January 18, 2009. (ECF No. 162, Pls.' Mem. Opp'n Defs.' Mots. Summ. J. 2 n.2.)

j2 Canada is a wholly-owned subsidiary of j2 Global, with multiple layers of subsidiaries between them. j2 Canada provides communications services, including web-based facsimile broadcasting, which it defines as a "means through which a customer can transmit a single facsimile to multiple destinations." (ECF No. 156, Pls.' Resp. j2 Canada's LR 56.1(a)(3) Stmt. ¶ 4.)[3] j2 Canada was formerly known as Protus IP Solutions, Inc. ("Protus") until an indirect subsidiary of j2 Global acquired Protus in December 2010. Taking its cue from the parties, the

---

[3]This statement is deemed admitted, as well as several other statements that defendants support by citing the declarations of David Allen Tough and David Guerrero. Many of plaintiffs' responses to fact statements supported by reference to the declarations consist only of an objection to the admission of the declarations and a request to depose the Declarants. (Curiously, plaintiffs' request to depose them does not appear in plaintiffs' briefs on their motion to strike the declarations, and in their reply brief on that motion, plaintiffs actually urge the Court to *reject* defendants' alternative proposal to reopen discovery and allow plaintiffs to take the depositions of the Declarants.) Plaintiffs chose not to respond to the substance of defendants' statements in the event that the Court denied their motion to strike and their request to depose the Declarants was denied. The Court has denied their motion to strike as to Tough and Guerrero's declarations and will not allow plaintiffs to depose them because the request is untimely. The consequence of plaintiffs' choice is that the statements are deemed admitted as uncontroverted. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Furthermore, in several instances, plaintiffs fail to provide support for a statement or attempt to support a denial with impermissible argument and/or evidence that does not provide such support. (*See, e.g.*, Pls.' Resp. j2 Canada's LR 56.1(a)(3) Stmt. ¶¶ 32, 34, 35, 44-46; ECF No. 157, Pls.' Resp. j2 Global's LR 56.1(a)(3) Stmt. ¶¶ 51-53, 65.) The Court has disregarded improperly-supported facts and impermissible argument and has deemed admitted improper denials of facts. The Court has also disregarded immaterial facts.

Court will refer to j2 Canada and Protus interchangeably throughout this opinion (with exception of the discussion below regarding the Protus Lawsuit).

Defendant Nicholas Chomakos is or was the owner and/or president of defendants Unified Marketing, United Vending, Sunrise, and Global Vending (collectively, "Chomakos"). Chomakos was in the business of installing vending machines for clients who owned such machines. When a client contacted Chomakos about placing a vending machine, Chomakos then sent a fax (the "Vending Machine Fax" or "Fax") to businesses within a certain geographic area that might want a vending machine located at their place of business, free of charge. For each vending machine placement, Chomakos's clients paid him a flat fee of $200 to $300. Chomakos began sending the Fax in 2004. He, along with non-parties Yuriy Mirskiy and another individual, created its content.

Sometime between 2007 and early 2009, Chomakos began exclusively using Mirskiy to send the Fax and to provide fax numbers to which to send it. Chomakos provided Mirskiy with zip codes of areas he wished to target, and Mirskiy responded by telling him how many fax numbers he "had" in those designated areas. Although Mirskiy arranged for the transmission of the Fax, he never disclosed to Chomakos what entity he used to do so.[4] That entity was UnixUSA, LLC ("Unix"), which is solely owned by an individual named Erol Sonmez. Unix, in turn, used other companies' fax-broadcasting systems to transmit faxes on behalf of its customers.[5]

---

[4]Chomakos testified at his deposition that he had never heard of Protus, j2 Canada, or j2 Global.

[5]Unix is not a corporate affiliate of Protus, j2 Canada, or j2 Global.

From 2005 through December 2010, Unix, through Sonmez, worked almost exclusively with Protus and Eyamie to send faxes. Eyamie was employed by Protus in 2009 and early 2010 as its Manager of Business Development.[6] In that capacity, Eyamie served as a commissioned sales representative for Sonmez and others. Eyamie handled customer inquiries, sold fax broadcasting and fax reception services, and performed various other duties, such as reporting on sales activities and maintaining customer relationships. With respect to Sonmez, Eyamie also handled billing matters, helped Sonmez obtain credit and multiple account numbers, addressed Sonmez's concerns about the speed with which his orders were transmitted, and supplied phone numbers through which fax recipients could opt out of receiving future transmissions ("opt-out" or "removal" numbers).

Sonmez, in turn, provided these opt-out numbers to Mirskiy to include on the Vending Machine Fax.[7] Mirskiy provided Sonmez with the Vending Machine Fax in a PDF file format, as well as a list of fax numbers to which to send the Fax. Sonmez then used Protus's service to send the Fax. Sonmez testified at his deposition that when sending the Fax through Protus, he used Protus's website to log in by entering his account number and password; uploaded the Fax and a spreadsheet of fax numbers obtained from Mirskiy; and set up a time for the fax broadcast. Protus's system would then automatically transmit the broadcast. Whenever Sonmez used Protus to transmit the Vending Machine Fax, he included the word "Vending" in the fax header.

Sonmez maintained a list of "do-not-fax" numbers that were to be excluded from any fax

---

[6]Eyamie was never employed by j2 Global.

[7]The Vending Machine Fax allegedly sent to Paldo, which is attached as Exhibit A to the Second Amended Complaint, bears the opt-out number 1-866-282-8543, which was one of the opt-out numbers Protus assigned to Sonmez.

transmissions. During a broadcast, Protus's system would compare the customer's list of recipient fax numbers to the customer's list of excluded fax numbers and suppress any transmission to the excluded numbers.

It is undisputed that the Vending Machine Fax was transmitted over j2 Canada's system and was not transmitted over j2 Global's system or using its services.[8] It is also undisputed that neither Sonmez nor Unix was ever a customer of j2 Global.

## SUMMARY JUDGMENT STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014); *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 499-500 (7th Cir. 2008). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (citation and internal quotation marks omitted). Where the moving party seeks summary judgment on a claim or defense as to which it bears the burden of proof, "it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). When the

---

[8] j2 Global states that the "Vending Machine Fax at issue in Plaintiffs' Second Amended Complaint was not transmitted over j2 [Global's] system or using j2 [Global's] services." (ECF No. 152, j2 Global's LR 56.1(a)(3) Stmt. ¶ 31.) Plaintiffs respond: "Plaintiffs[] admit the Vending Machine Fax was transmitted over j2 Canada/Protus'[s] system." (Pls.' Resp. j2 Global's LR 56.1(a)(3) Stmt. ¶ 31.) That is an incomplete response to the statement. Accordingly, the statement is deemed admitted.

nonmovant has the burden of proof, the moving party can satisfy its burden on summary judgment by "pointing out to the district court" that there is no evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). "Upon such a showing, the nonmovant must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'" *Modrowski*, 712 F.3d at 1168 (quoting *Celotex*, 477 U.S. at 322).

Summary judgment is often called the "put up or shut up" moment in litigation, which means that the nonmovant "is required to marshal and present the court with" evidence on which a reasonable jury could rely that would permit a finding in the nonmovant's favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

## DISCUSSION

### A.    TCPA

The TCPA imposes limitations on "junk-fax transmissions." *Soppet v. Enhanced Recovery Co.*, 679 F.3d 637, 638 (7th Cir. 2012). With certain exceptions, the statute forbids the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C). To implement the TCPA, the Federal Communications Commission ("FCC") promulgated regulations, which define the "sender" of a fax as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10). In addition to a sender's liability for junk faxes, FCC regulations also provide that a "facsimile broadcaster," which is defined as a "person or entity that transmits messages to telephone facsimile machines on behalf of another person or entity for a fee," *id.* § 64.1200(f)(7), is liable for the sending of unlawful fax advertisements

when the broadcaster "demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions," *id.* § 64.1200(a)(4)(vii).

Plaintiffs assert that the j2 Defendants are fax broadcasters with a high degree of involvement in the sending of the Vending Machine Faxes.[9] Although there is no statute or regulation that defines "high degree of involvement," the FCC has issued orders and rules finding that a fax broadcaster demonstrates a high degree of involvement in the transmission of fax advertisements when it 1) supplies the fax numbers used to transmit the advertisement or a source of fax numbers; 2) makes representations about the legality of faxing to those numbers; 3) advises a client about how to comply with the fax advertising rules; or 4) reviews, assesses, or determines the content of a fax message. In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 (Report and Order and Third Order on Reconsideration), 21 FCC Rcd. 3787, 3808 (Apr. 6, 2006); Rules and Regulations Implementing the Tel. Consumer Prot. Act (TCPA) of 1991, 68 Fed. Reg. 44144, 44169 (July 25, 2003). Federal courts also have stated that a "'high degree of involvement' exists where the broadcaster (1) controls the recipient lists; and/or (2) controls the content of the transmissions." *Rinky Dink, Inc. v. Elec. Merch. Sys.*, No.

---

[9]There is no evidence that supports the j2 Defendants' liability on a theory that they were "senders" of the Vending Machine Fax. The Vending Machine Faxes do not advertise the j2 Defendants' goods or services, nor were they sent on behalf of the j2 Defendants. Although plaintiffs deny that the Vending Machine Fax was not sent on the j2 Defendants' behalf, the basis for that denial is that the j2 Defendants allegedly had a "high degree of involvement in and actual notice" of the fax's unlawful transmission. In the Court's view, those factors are separate considerations. Plaintiffs cite no authority in support of the proposition that a high degree of involvement means that a fax was sent on one's behalf, nor do they develop any argument that either of the j2 Defendants was a "sender."

C13-1347-JCC, 2015 WL 778065, at *7 (W.D. Wash. Feb. 24, 2015); *Selou v. Integrity Sol. Servs. Inc.*, Civil Case No. 15-10927, 2016 WL 612756, at *5 n.6 (E.D. Mich. Feb. 16, 2016).

**B.      j2 Canada's Motion**

j2 Canada contends that it is entitled to summary judgment because it lacked both a high degree of involvement in the transmission of the Vending Machine Fax and actual notice of unlawful activity.  An initial question that the parties do not address is whether plaintiffs have the burden of proving as part of their TCPA claim that defendants had such involvement or notice, or whether the lack of such involvement or notice is an affirmative defense on which defendants bear the burden of proof.  *See, e.g.*, *Merch. & Gould, PC v. Premiere Glob. Servs., Inc.*, 749 F. Supp. 2d 923, 936 (D. Minn. 2010) (suggesting that it is an open question whether the FCC's "facsimile broadcaster exemption" is a defense to TCPA liability or an element of a plaintiff's TCPA claim).  For purposes of the instant motions, the Court will treat the lack of a high degree of involvement as an affirmative defense because defendants treated it as such in their answers,  (ECF Nos. 84 & 85), and will do the same as to the issue of notice.

The Court first notes that plaintiffs fail to support with evidence one of their most basic allegations.  As outlined above, the TCPA premises liability on fax transmissions.  In plaintiffs' statement of additional facts (in response to both motions for summary judgment), they state that the "'Vending Machine Fax' sent to Plaintiff Paldo, attached as Exhibit A to the Second Amended Complaint . . . was received by Paldo on September 28, 2009."  (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 9.)  In support of that statement, plaintiffs cite only Exhibit A itself, the Fax, which does not reflect that it was sent to Paldo, nor does it bear the recipient's fax number. The j2 Defendants state in response to plaintiffs' statement that Exhibit A does not support the statement that Paldo received the Vending Machine Fax, but defendants do not discuss the issue

in their summary-judgment reply briefs, possibly because there is other evidence that shows that j2 Canada transmitted the Fax to Paldo. The fact that plaintiffs have not submitted evidence that the Fax was indeed sent to Paldo appears to the Court to be a critical defect in their response to the instant motions, but because defendants do not develop a pertinent argument, the Court will proceed to discuss the other issues defendants raise.

### 1. High Degree of Involvement

The Court will examine each of the factors set out by the FCC to determine whether a fax broadcaster is highly involved in a fax transmission. The first is whether the broadcaster supplies the fax numbers used to transmit the advertisement or supplied a source of those numbers. The record shows that Mirskiy supplied Sonmez with the fax numbers to which the Vending Machine Fax was sent, and the unrebutted evidence is that j2 Canada did not do so, nor did it supply Sonmez with a source of fax numbers.

The Court will consider the next two factors together—whether j2 Canada made representations about the legality of faxing to the numbers to which the Vending Machine Fax was sent or advised a client about how to comply with the fax advertising rules. Sonmez testified that no one told him that it was legal to send the Fax to the numbers that Mirskiy had provided; Protus never made any representations about the legality of faxing to those numbers; and Protus did not advise him how to comply with junk-fax rules. (ECF No. 149-5, Dep. of Erol Sonmez 69, 90-91.) Eyamie also testified that he and Sonmez never discussed the legality of sending faxes. (ECF No. 149-7, Dep. of Tyler Eyamie 71.) Tough states in his declaration that j2 Canada has never provided its customers legal advice about their faxing activity. (Decl. of David Allen Tough ¶ 11.)

Plaintiffs contend that there is evidence creating a genuine issue of material fact as to these factors in that Protus "advised" Sonmez regarding TCPA compliance "by requiring [Unix] to obtain removal numbers from Protus."  (Pls.' Mem. Opp'n Defs.' Mots. Summ. J. 14.)  Their sole support for this argument is the following exchange at Sonmez's deposition:

> Q.  You testified that Protus had assigned you some toll-free removal numbers; is that correct?
>
> A.  Yes.
>
> Q.  Did you have to request those removal numbers from Protus?
>
> A.  No.  At first, okay, they—I don't remember exactly.  But at first, I only had the number.  And later, I think they told me: You need to have a removal number, so you need to use some kind of removal number for your customers. . . .  We can provide you one. . . . I said, okay, so just give me one, okay?  And then when my account was assigned to Protus, I got a removal number.

(Sonmez Dep. 72.)  This testimony is insufficient to create a genuine issue as to whether Protus made representations about the legality of faxing to the numbers to which the Vending Machine Fax was sent or advised Sonmez about legal compliance.  Even if it could be reasonably inferred from Sonmez's testimony that Protus actually required him to obtain a removal number rather than simply anticipated that he would want one, there is no evidence that Protus gave Sonmez legal advice regarding his use of the number, and in fact the evidence is to the contrary.  In a follow-up exchange, Sonmez confirmed that "it was up to [him] whether to use the removal number on [his] faxes."  (*Id.* at 73.)  Furthermore, as stated above, Sonmez also testified that Protus did not give him legal advice.

Plaintiffs also argue that Protus's mere provision of opt-out numbers to Sonmez and its other customers indicates that it was highly involved in the transmission of the Vending Machine Fax.  In support, plaintiffs cite *In re Fax.com, Inc.*, 19 FCC Rcd. 748 (Jan. 5, 2004) [hereinafter

*Fax.com II*], an Order of Forfeiture in which the FCC found that Fax.com had willfully and repeatedly violated the TCPA. *Fax.com II*, however, is distinguishable. The FCC concluded therein that Fax.com had continued sending unlawful faxes even after it had received actual notice from the FCC that its activities violated federal law. In a previous Notice of Apparent Liability for Forfeiture, the FCC had concluded that Fax.com was actually a fax sender and not just a broadcaster, because it maintained its own list of recipient fax numbers, knowingly sent advertisements to such numbers without regard to legality, and reviewed and assessed the content of its clients' advertisements. *In re Fax.com, Inc.*, 17 FCC Rcd. 15927, 15935-36 (Aug. 7, 2002) [hereinafter *Fax.com I*]. Contrary to plaintiffs' assertion, *Fax.com II* does not stand for the proposition that a fax broadcaster's provision of opt-out numbers alone can indicate a high degree of involvement in fax transmissions; rather, the FCC discussed Fax.com's provision of opt-out numbers in the context of Fax.com's argument that there was insufficient evidence that it had even transmitted the faxes. 19 FCC Rcd. at 756-57. Moreover, as j2 Canada points out, the FCC concluded in *In re Cyberdata, Inc.*, 25 FCC Rcd. 17045, 17046-47 (Dec. 8, 2010), that even where a fax broadcaster admitted that it "strongly advise[d]" all of its clients to "provide an 'opt-out' facility on every document they send," there was "no evidence" that the broadcaster had determined the content of fax messages, made representations about the legality of faxing, or advised a client about how to comply with the fax advertising rules. The Court rejects plaintiffs' attempt to shoehorn Protus's provision of opt-out numbers into the factors enumerated by the FCC through the mischaracterization of this conduct as the provision of legal advice and/or control of the Fax's content.

As to the fourth factor outlined by the FCC—whether Protus reviewed, assessed, or determined the content of a fax message—j2 Canada submits evidence that at all relevant times,

Protus did not create or make changes to the content of the Vending Machine Fax created by Mirskiy; customers of j2 Canada and Protus have exercised exclusive control over the substantive content of their fax broadcasts; and neither j2 Canada nor Protus edited or provided artwork for use in customers' faxes or assisted customers in resizing, reshaping, rescaling, or changing the font size or style or other characteristics of their fax messages. (Sonmez Dep. 66; Tough Decl. ¶¶ 8-9.) In addition, at all relevant times, j2 Canada and Protus's fax-broadcasting services have been exclusively web-based, where a customer uploads its own fax image and list of recipient numbers to the web portal for automatic transmission. (Tough Decl. ¶ 7.)

On this issue, plaintiffs hang their hats on the following statement contained in a declaration made by Sonmez that was filed in connection with Eyamie's motion to dismiss: "Eyamie would assist me in preparing my clients' fax images . . . ." (ECF No. 64-4, Decl. of Erol Sonmez ¶ 20.) Given the specific evidence submitted by defendants about the process Sonmez used to set up a fax broadcast through Protus's system, Sonmez's vague statement does not establish a genuine dispute about whether Eyamie reviewed or assessed, or determined or controlled the content of, the Vending Machine Fax. At his deposition, Sonmez clarified what he had stated in his declaration as follows:

> Q. Mr. Sonmez, I want to direct your attention to Paragraph 20, which is the next page, Page ID 557. This declaration states that Eyamie would assist me in preparing my clients' fax images. What do you mean by that? Are you meaning technical assistance or mail merge assistance? What do you mean?

> A. No. Like Eyamie will help me like when I prepare those images and faxes. I was, you know, emailing to their broadcasting and putting the cc Tyler Eyamie. So Tyler Eyamie will just help me to boost those faxes, calling them, hey, you know, help [Sonmez] so his faxes can go faster, so just assist me with those, you know, jobs that I sent to their broadcasting.

> Q. So you would ask Tyler to help get your fax broadcast out quicker if there was a log [sic] in the system or something?

A.  Yes.

(Sonmez Dep. 79-80.)  Thus, the "preparation" Sonmez mentioned had occurred after he had

uploaded the Fax to Protus's system; he gave no indication that Eyamie had anything to do with

the Fax's content.  Sonmez also testified that because he received his fax images as PDF files,

neither he nor Protus changed or could change their content, and he could not recall whether he

even discussed the content of the fax images with Eyamie.  (*Id.* at 52-53, 65-66.)

Perhaps acknowledging that they have not presented sufficient evidence to go to a jury on

the question of j2 Canada's involvement under the factors set out by the FCC, plaintiffs contend

that there is other evidence that j2 Canada was "more than a mere conduit" for Sonmez's fax

advertising.  Plaintiffs cite Protus's provision of credit and multiple account numbers to Sonmez,

as well as better fax-transmission rates for large jobs; j2 Canada's generation of revenue, and

Eyamie's generation of commissions, as a result of Sonmez's business; Eyamie's assisting

Sonmez with the speed of his transmissions as well as with "mail merge" fax transmission;[10] and

Eyamie's suggestion that Sonmez use Accelero for fax transmissions after Protus was purchased

and Eyamie was laid off from employment with j2 Canada.  Plaintiffs cite no authority for the

proposition that such conduct demonstrates a high degree of involvement in the transmission of

the Vending Machine Fax.  In the Court's view, plaintiffs' interpretation of what constitutes a

"high degree of involvement" is much too broad; these circumstances demonstrate merely that

Protus acted as Sonmez's conduit for fax broadcasting.  And the fact that Sonmez and Eyamie

---

[10]There is evidence that until 2007 or 2008, Eyamie assisted customers with the "mail merge" of fax list with a fax image, but this evidence is irrelevant to the instant motions because plaintiffs do not dispute that the statute of limitations bars them from recovering for faxes sent prior to January 18, 2009.

appear to have had a friendly business relationship does not bear on the extent of Protus's involvement, as defined by the FCC, in the transmission of the Fax.

j2 Canada has satisfied its burden of demonstrating that it lacked a high degree of involvement in the transmission of the Vending Machine Fax, and plaintiffs have failed to come forward with evidence that would reasonably permit a factfinder to find in their favor on that issue.

### 2. Actual Notice

j2 Canada maintains that plaintiffs cannot prove that it had actual notice of the alleged unlawful transmission of the Vending Machine Fax to plaintiffs. The parties have not cited, and the Court is unaware of, any applicable FCC guidance or regulations that define the term "actual notice." The Court notes that in *Fax.com I*, the FCC stated that Fax.com had been provided "with actual notice that its fax broadcasting activities do not comply with federal law" by way of having received FCC citations for violating the TCPA. *Fax.com I*, 17 FCC Rcd. at 15936. For purposes of the instant motions, though, the Court will apply a broader construction of the term "actual notice" that encompasses notice received in other ways besides communications from the FCC.

j2 Canada argues that it did not have actual notice of unlawful activity because it did not receive any notice that any Vending Machine Fax had been transmitted in violation of any law; Eyamie did not know the recipients of the Fax or their fax numbers; Eyamie testified that he had no reason to think that Sonmez was using Protus's system to send unlawful faxes; and Eyamie did not have prior knowledge of Sonmez's use of Protus's system to send faxes or knowledge of any specific fax transmissions by Sonmez. (Tough Decl. ¶ 23; ECF No. 149-7, Eyamie Dep. 47,

54-55; ECF No. 149-8, Dep. of Tyler Eyamie 66-67; ECF No. 149-9, Decl. of Tyler Eyamie ¶ 43.)

Plaintiffs contend that there is a genuine issue of material fact as to j2 Canada's actual notice because 1) j2 Global (not j2 Canada) sued Protus in February 2006, years prior to Protus's acquisition by a j2 entity, and alleged therein (the "Protus Lawsuit") that Protus had engaged in a junk-faxing scheme; and 2) an entity called AGV Sports Group, Inc. sued Protus in 2008 for allegedly sending at least 974 unsolicited fax advertisements in violation of the TCPA, and j2 Global disclosed the suit in a 2010 Securities and Exchange Commission filing. The Court disagrees. Plaintiffs cite no authority in support of their argument, and it simply does not follow, that a different j2 entity's allegations in 2006 that Protus was engaging in an unlawful junk-fax operation and a third party's similar allegations against Protus in 2008, where there is no evidence that either lawsuit was premised upon any conduct of Sonmez or Unix, creates a genuine issue as to whether j2 Canada had actual notice that Sonmez was using the Protus system to send unlawful faxes from 2009 through 2011. The connection is far too tenuous to permit such an inference.

Plaintiffs also assert that they are "entitled to the inference that j2 Canada had actual knowledge that its customers, including [Unix], were engaging in unlawful fax-blasting" because there is evidence that Unix "successfully sent the Vending Machine Fax over 2 million times," and Eyamie's testimony that he had no reason to think that Sonmez was engaging in unlawful activity is therefore "simply unbelievable." (Pls.' Mem. Opp'n Defs.' Mots. Summ. J. 18.) Aside from the invitation to evaluate Eyamie's credibility, which the Court may not do on summary judgment, *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007), there are three problems with plaintiffs' argument. First, it cannot reasonably be inferred from the evidence on

which plaintiffs rely that Unix or Sonmez used Protus or j2 Canada to send the Vending Machine Fax more than two million times. Plaintiffs rely on the declaration of Ross Good, an attorney who represents them in this action, who states that in 2012, his office issued a third-party subpoena to j2 Global for records in a different lawsuit, and David Guerrero responded on j2 Global's behalf by producing Unix's transmission logs. (ECF No. 170, Decl. of Ross Good ¶¶ 2-3.)[11] Guerrero informed Good that any transmission with a corresponding status code of "130" had been successful. (*Id.* ¶ 4.) Good reviewed the logs provided by Guerrero and determined that there are "2,004,962 records of faxes attempted between January 18, 2009 and December 2, 2010 with the word "Vending" in the header" that have such a status code. (*Id.* ¶¶ 5-6.) Although Sonmez testified that he included the word "Vending" in the header of Vending Machine Fax when he used Protus to transmit it, he did not testify that he used the word in the fax header exclusively for Mirskiy's faxes. And, when asked whether he had used the word in headers for other customers, Sonmez replied: "If they ask me, yes, if they ask me, like if there is another guy who is doing the same business, if they did, okay. If they say put "vending" on the top, I have to put it because they are the customer." (Sonmez Dep. 71-72.) While Sonmez acknowledged that he could not recall any customer besides Mirskiy who had requested that he use the word in a header, he also stated that the word was not associated with any specific customer. (*Id.* at 71, 89.)

Second, even if it could be reasonably inferred that every fax with that contained the header "Vending" was in fact the Vending Machine Fax, and that the Fax was sent more than

---

[11]Good's declaration is among the documents defendants move to strike. Defendants assert, *inter alia*, that the declaration is inadmissible. For purposes of judicial economy, the Court assumes the declaration's admissibility and declines to strike it in light of the fact that its substance does not create a genuine issue of material fact as to j2 Canada's actual notice of unlawful activity.

two million times, there is no evidence that Eyamie had knowledge of this number. Good derives his figure from a review of the transmission logs provided by Guerrero, and although plaintiffs point out that Eyamie could "see his individual customers" and the commissions related to each customer, plaintiffs do not point to evidence that Eyamie had reviewed any transmission logs. Third, and perhaps most importantly, plaintiffs fail to cite any authority supporting their position that the sheer volume of faxes sent by a customer can put a fax broadcaster on actual notice that the customer is engaging in unlawful activity. Plaintiffs do not develop their argument by explaining the significance of the number or by providing the Court with any context, such as industry standards or norms.

j2 Canada has shown that the record is so one-sided as to rule out the prospect of a finding that it was the sender of the Vending Machine Fax, controlled recipient lists or the content of transmissions, was otherwise highly involved in the transmission of the Fax, or had actual notice of the allegedly unlawful activity at issue. Accordingly, the Court grants j2 Canada's motion for summary judgment.

## C.    j2 Global's Motion

j2 Global contends that there is no evidence that ties it to the conduct underlying plaintiffs' claims. The Court agrees. The undisputed evidence is that the Vending Machine Fax was not transmitted over j2 Global's system or using its services. It is also undisputed that j2 Global did not employ Eyamie and did not have Unix as a customer. As j2 Global points out, the Vending Machine Fax did not advertise j2 Global's goods or services and was not sent on its behalf, nor did j2 Global supply any fax numbers used to transmit the Fax or a source of those numbers, make any legal representations about the legality of faxing to the numbers, control

recipient lists, advise a client about how to comply with fax advertising rules, or review, assess, determine, or control the content of the Fax.

Plaintiffs state in a conclusory fashion that there are genuine issues of material fact as to whether j2 Global had a high degree of involvement in the transmission of the Vending Machine Fax, but they fail to develop any argument whatsoever on that issue. Plaintiffs do attempt to develop an argument, however, that j2 Global "was fully aware of j2 Canada/Protus'[s] unlawful faxing activities" and that a genuine issue of material fact therefore exists as to j2 Global's actual notice and failure to take steps to prevent unlawful activity. (Pls.' Mem. Opp'n Defs.' Mots. Summ. J. 20.) This strikes the Court as a strange argument, given the undisputed fact that j2 Global's system was not used to send the Fax. Plaintiffs' submissions hint at some sort of derivative liability, but plaintiffs do not present or develop argument on such a theory.

Although it appears that the Court need not reach the actual-notice issue because there is no evidence that connects j2 Global with the transmission of the Vending Machine Fax, the Court will briefly discuss plaintiffs' contentions regarding notice. Plaintiffs' opposition to j2 Global's motion is based entirely on two pieces of evidence. The first is the Protus Lawsuit, which is discussed above. But j2 Global's general allegations against Protus, made three years prior to the conduct at issue here, are irrelevant to the instant claim because there is no evidence that the prior lawsuit involved the transmission of the Vending Machine Fax. The other evidence on which plaintiffs rely consists of various SEC filings by j2 Global in 2010, 2011, and 2012. One of the filings refers to the 2008 lawsuit by AGV Sports Group against Protus, discussed above. Like the 2006 lawsuit against Protus, the fact of the AGV lawsuit is irrelevant to plaintiffs' claim where there is no evidence that the suit had anything to do with the Vending Machine Fax. The other SEC filings plaintiffs cite simply demonstrate that j2 Global, in its own

words, relies "heavily" on revenue generated by its fax services. (ECF No. 161-1 at 23.) It cannot reasonably be inferred merely from this fact that j2 Global had knowledge of illegal activity by its customers, or Unix in particular. Plaintiffs' position is untenable and verges on reading the fax-broadcaster exemption out of the FCC's TCPA regulations.

j2 Global has demonstrated that the record is so one-sided as to rule out the prospect of a finding that it was the sender of the Vending Machine Fax, controlled recipient lists or the content of transmissions, was otherwise highly involved in the transmission of the Fax, or had actual notice of the allegedly unlawful activity at issue. Accordingly, the Court grants j2 Global's motion for summary judgment.

In light of these rulings, the Court need not reach defendants' arguments that the TCPA is unconstitutional.

## CONCLUSION

The motions of defendants j2 Global Canada, Inc. and j2 Global, Inc. for summary judgment [147, 150] are granted, and the Court will enter judgment in favor of those defendants. Plaintiffs' motion to strike declarations and portions of defendants' motions, memoranda, and fact statements; to bar certain evidence; and to set a briefing schedule on class certification [153] is denied in large part and granted only as to the Declaration of Teruko Furuya [152-13], which is stricken. The motion of defendants j2 Global Canada, Inc. and j2 Global, Inc. to strike portions of plaintiffs' memorandum in opposition to defendants' motions and statement of additional facts [175] is denied.

A status hearing is set for March 29, 2017 at 10:30 a.m. to discuss the next steps in this case as to the remaining defendants.

SO ORDERED.                    ENTERED:    March 10, 2017

_____
**JORGE L. ALONSO**
**United States District Judge**